UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

West Linn Paper Company,                                    Civ. No. 13-1678 (PAM/JJK)

                            Plaintiff,

v.                                                    **MEMORANDUM AND ORDER**

BTC-USA Inc., and John
Bourgeois,

                            Defendants.

_____

This matter is before the Court on the parties' cross-Motions for Partial Summary

Judgment.  For the reasons that follow, Plaintiff's Motion is granted in part and denied in

part, and Defendants' Motion is denied.

**BACKGROUND**

For 18 years, Defendant BTC-USA, Inc., sold paper manufactured by Plaintiff West

Linn Paper Company to two entities:  American Spirit Graphics ("ASG") and Amidon

Graphics.  Much of the dispute in this case centers on the nature of the relationship between

West Linn and BTC.  West Linn contends that BTC is a "broker" that merely re-sold West

Linn's paper, and that ASG and Amidon were BTC's customers.  (Am. Compl. ¶¶ 1-2.)  BTC

contends that BTC was a de facto sales representative for West Linn, and that West Linn

solely dictated the terms of BTC's sales to ASG and Amidon, paying BTC a set commission

on each sale.  There is no dispute that West Linn would bill BTC for the paper, and BTC

would in turn bill ASG and Amidon, paying West Linn after BTC received payment from

ASG and Amidon.  (Kilby Decl. (Docket No. 52) Exs. 5, 6 (BTC purchase orders to West

Linn and invoices to ASG); Ex. 2 (Bourgeois Dep.) at 47.)  There is also no dispute that BTC retained a fixed percentage of ASG's or Amidon's payment as its profit.  (Id. Ex. 2 (Bourgeois Dep.) at 48; Ex. 1 (Huskey Dep.) at 162-63.)  West Linn refers to this as a trade discount; Defendants contend that it represents a sales commission.

BTC's sales of West Linn's paper to ASG represented nearly 95% of BTC's annual revenue.  (Bourgeois Decl. (Docket No. 48) ¶ 18.)  In May 2013, ASG informed BTC that it would no longer buy West Linn paper from BTC, but would use another entity called Unisource.  (Krause Decl. (Docket No. 55) ¶ 6 & Ex. A.)  The parties dispute how this decision came about.  BTC contends that West Linn and ASG conspired to kick BTC out of the picture; West Linn claims that the decision to go with another supplier was ASG's alone.

At the time ASG terminated its relationship with BTC, ASG had several paper orders outstanding with BTC.  (Hunger Decl. (Docket No. 54) ¶ 4 & Ex. E.)  West Linn shipped those orders directly to ASG, per the parties' custom, and ASG paid BTC for those orders.[1] On April 30, 2013, BTC issued a check for just over $88,000 to West Linn in partial payment for some of the orders, but after ASG terminated its relationship with BTC, BTC stopped payment on the check.  (Van Oort Aff. (Docket No. 49) Exs. 7, 8; Kilby Decl. (Docket No. 52) Ex. 13.)  According to West Linn, BTC owes West Linn nearly $260,000 for paper West Linn shipped to ASG and Amidon in late April and early May 2013, and for which BTC

---

[1]  Amidon also had orders outstanding in May 2013 that were shipped and paid for. Although the Amidon orders are part of West Linn's alleged damages, the parties' arguments focus on the ASG orders.

received full payment from ASG and Amidon.

BTC's sole employee and president/CEO is Defendant John Bourgeois.  West Linn contends that in May 2013, Bourgeois emptied BTC's bank account, paying himself nearly $270,000 and rendering BTC insolvent and judgment-proof.  (Kilby  Decl. (Docket No. 52) Exs. 16-17.)  To date, BTC has not paid West Linn for any of the paper West Linn shipped to ASG and Amidon from late April through May 2013.

West Linn's Amended Complaint raises seven claims against BTC and Bourgeois: breach of contract (Count I),  account stated (Count II), unjust enrichment (Count III), fraud (Count IV), issuance of worthless check in violation of Minn. Stat. § 604.113 (Count V), and violation of the Minnesota Uniform Fraudulent Transfer Act ("MUFTA") (Count VI).  West Linn's final count (Count VII) is brought against Bourgeois alone, and contends that West Linn may pierce the corporate veil so that Bourgeois is personally liable for all of West Linn's claims against BTC.

BTC and Bourgeois brought three counterclaims against West Linn.  The first contends that West Linn violated Minnesota's Termination of Sales Representative Act, Minn. Stat. § 325E.37, by terminating BTC without good cause and without notice. According to Defendants, West Linn owes BTC commissions for all of West Linn's sales to ASG for the 180-day period after the alleged wrongful termination, plus what Defendants estimate to be the amount BTC would have received from commissions until Bourgeois's retirement in approximately five years.  Defendants' second counterclaim alleges that West Linn breached an oral sales representative agreement with BTC.  Finally, the third

counterclaim contends in the alternative that West Linn's conduct constitutes tortious interference with contract and tortious interference with business relations.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

West Linn's Motion seeks summary judgment against all of Defendants' counterclaims and several of West Linn's claims, and asks for a judgment in the amount of the damages West Linn alleges. Defendants' Motion seeks summary judgment only on West Linn's contention that veil-piercing is appropriate. Defendants ask that Bourgeois be

dismissed from the lawsuit.

## A.    West Linn's Motion

West Linn seeks summary judgment on all of Defendants' counterclaims: breach of the alleged oral sales representative contract, the alleged breach of Minnesota's Termination of Sales Representative Act, and alleged tortious interference with BTC's relationship with ASG. In addition, West Linn seeks summary judgment on its own breach of contract claim, and an award of $258,016.35, which is the amount it contends BTC owes West Linn for the April and May 2013 paper shipments to ASG and Amidon. West Linn also contends that summary judgment is warranted on its claims under the worthless check statute and MUFTA. Finally, West Linn asks for an order piercing the corporate veil and setting aside the May 2013 payments from BTC to Bourgeois. Defendants do not oppose the Motion as it relates to their counterclaim for breach of an alleged oral contract, apparently conceding that this claim should be dismissed.

### 1.    West Linn's Claims

#### a.    Breach of Contract

The Amended Complaint alleges that BTC contracted to purchase West Linn's paper "on the terms stated in the Unpaid Invoices . . . and the Credit Application and Agreement." (Am. Compl. ¶ 31.) West Linn's summary-judgment Motion argues that the U.C.C. applies, and that there was a contract under the U.C.C. because West Linn's shipment of paper under BTC's invoice constituted acceptance of BTC's "offer" to buy the paper. See Minn. Stat. § 336.2-206(1)(b).

Defendants protest what they see as a change in legal theory from the Amended Complaint to the summary-judgment briefing.  But a breach of contract under the U.C.C. is not substantively different from a breach of contract in other circumstances.  Rather, the U.C.C. merely provides the framework for a determination of offer and acceptance, which are required for the formation of any contract whether related to the sale of goods or otherwise.  In other words, West Linn's argument in its moving papers is merely that, in this case, offer and acceptance can be established—and a binding contract thereby formed—by BTC's invoices ordering paper from West Linn and West Linn's prompt shipment of that paper.  Whether West Linn points to the parties' written agreements and invoices or to the U.C.C. to support its claim, its theory is the same:  by failing to pay West Linn for the paper West Linn shipped to ASG, BTC breached its contract with West Linn.

Thus, Defendants' first contention, that ASG, not BTC, was the "buyer" for purposes of the U.C.C., is ultimately not relevant to West Linn's claim that BTC's failure to pay constituted a breach of contract.  There is no dispute that BTC sent paper orders to West Linn and that West Linn shipped the paper as those orders requested.  That ASG was the ultimate recipient of the paper is irrelevant, because, having received payment from ASG, BTC does not and cannot argue that BTC was not required to in turn pay West Linn for that paper.  Similarly, Defendants' insistence that West Linn, not BTC, set the price for the paper does not mean that West Linn has no claim for breach of contract.  The parties clearly agreed to the price term for the paper, as BTC requested paper at a certain price and West Linn shipped the paper at that price.

6

Nor is Defendants' argument regarding who took title to the paper on point.  There is no requirement under either the U.C.C. or contract law in general that title to the goods must pass from West Linn to BTC in order for West Linn and BTC to have a contract. Companies are free to contract for the delivery of goods and the title thereto to another entity, which is exactly what occurred here.[2]

West Linn has established the elements of its breach-of-contract claim:  formation of a contract, West Linn's performance under that contract, BTC's breach, and damages.  Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011).  Defendants do not argue that there are any defenses that might negate West Linn's damages or excuse Defendants' failure to pay as promised.[3]  Absent any genuine issue of fact as to a defense or excuse, West Linn is entitled to summary judgment on its breach-of-contract claim.

West Linn also argues that summary judgment is appropriate as to its claim for attorney's fees and costs.  According to West Linn, the governing contract is the Credit Application and Terms and Conditions the parties entered into at the beginning of their relationship, which provided for attorney's fees and costs for any collection action on unpaid invoices.  (Hunger Decl. (Docket No. 54) Ex. A.)  Defendants contend that this agreement

[2] At the hearing Defendants offered purportedly new authority for their argument that the U.C.C. does not apply.  This authority, a 1983 case from the Southern District of Ohio, is neither on point nor binding, and it is in any event a decision that Defendants' research should have uncovered before the hearing.

[3] In their opposition to claims other than West Linn's breach-of-contract claim, Defendants argue that BTC's failure to pay should be excused for various reasons.  But Defendants do not make the same arguments with regard to the breach-of-contract claim.

is no longer in force because of two changes to the terms of those agreements in the intervening years: a March 1998 increase in BTC's credit limit with West Linn  (id. Ex. C), and a September 2010 revision to early payment discount terms (id. Ex. D).  West Linn contends that these changes merely modified the Terms and Conditions agreement, but did not replace that agreement.

The parties' original Credit Application and Terms and Conditions set forth the terms of the parties' agreement, including an early payment discount of two percent if invoices were paid within 30 days, a reservation of rights, a limitation on West Linn's liability for failure to deliver goods due to circumstances beyond its control, a provision for attorney's fees and costs, and a choice-of-venue provision.  (Id. Ex. A.)  The first document that Defendants allege constituted a substitution for this original contract is a one-sentence letter to BTC stating that BTC's credit line was increased to $400,000.  (Id. Ex. C.)  The second alleged substitute contract is a letter to "Valued West Linn Paper Customer" stating that West Linn was "revising" its cash payment discount terms for certain grades of paper to one percent for payment within 21 days.  (Id. Ex. D.)

"[W]hether particular facts amount to modification of a contract is a question of law." Cousineau v. Norstan, Inc., 322 F.3d 493, 496 (8th Cir. 2003).  Here, it is not a close question whether the two alleged substitute contracts were indeed substitutes for the parties' original agreement.  The first letter was merely an increase in BTC's credit line and does not reference any other aspect of the Terms and Conditions.  The second letter was not specific to BTC and states on its face that it is only revising a certain term of the parties' previous

8

agreement.  The Terms and Conditions continued to govern the parties' relationship and thus West Linn, having established that BTC breached the parties' contracts, has also established that it is entitled to its attorney's fees and costs incurred in collecting the past due amounts.

      b.    <u>Worthless Check Statute</u>

Minnesota Statute § 604.113 provides that a person issuing a check that is dishonored is liable for the amount of the check "plus a civil penalty of up to $100 or the value of the check, whichever is greater," interest, and reasonable attorney's fees.  Minn. Stat. § 604.113, subd. 2(b)(1)-(3).  West Linn seeks to hold Defendants liable under this statute for the check BTC issued to West Linn on April 30, 2013, in the amount of $88,223.70.  There is no dispute that Bourgeois stopped payment on this check before West Linn could cash it, so when West Linn tried to cash the check, the bank dishonored the check.  Defendants have not paid West Linn for the dishonored check.

But the statute is not as automatic as West Linn argues.  The statute provides that "dishonor due to a stop payment order requested by an issuer who has a good faith defense to payment on the check" is not included in the statute's definition of "dishonor."  <u>Id.</u> § 604.113, subd.1(e).  Here, Defendants claim that they had a good faith defense to payment: they believed that West Linn had improperly terminated BTC as a sales representative and thus that they were due damages from West Linn.  Although Defendants fail to cite any legal authority about what constitutes good faith under the statute or whether the withholding of funds in anticipation of a future damages verdict is appropriate, neither does West Linn counter this good-faith argument in its reply memorandum.  In any event, BTC's good faith

9

is not something that can be determined on a paper record.  West Linn is not entitled to summary judgment on this claim.

      c.    <u>MUFTA</u>

West Linn contends that several payments from BTC to Bourgeois were fraudulent transfers within the meaning of Minnesota's Uniform Fraudulent Transfer Act.  In particular, West Linn challenges the following payments to Bourgeois:

- $4,800 for rent on May 1, 2013

- $55,000 dividend payment on May 3, 2013[4]

- $25,000 for expense reimbursements on May 3, 2013

- $15,816.24 for repayment of a loan from Bourgeois to BTC on May 7, 2013

- $150,000 for repayment of the same loan on May 31, 2013

- $4,800 for rent on May 31, 2013

- $9,000 in dividends on June 3, 2013

- $4,724.15 for expense reimbursements on June 3, 2013

West Linn points out that there is no lease agreement in the record to document the rent payments, that there are no receipts supporting the expense reimbursements, and that the loan from Bourgeois to BTC is also undocumented.  The loan consists of a home equity line of

---

[4] Defendants contend that $10,000 of this amount is Bourgeois's normal $2,000 per month salary for the months of January through May.  (Kilby Decl. (Docket No. 52) Ex. 3 (Bourgeois Dep.) at 24-25.)  As West Linn notes, however, there are withdrawal entries in BTC's bank accounts for each of those months representing Bourgeois's salary minus withholdings.  (<u>Id.</u> Ex. 18.)  Thus, it appears that Bourgeois is either mistaken about the purpose of the May 3 payment or was paid double salary for that five-month period.

credit secured by Bourgeois's home and is not accounted for on BTC's books in any way.

BTC made all of these payments to Bourgeois after ASG terminated its relationship with

BTC, and the payments left BTC with insufficient assets to pay West Linn's invoices for

paper West Linn shipped to ASG and Amidon.

West Linn challenges these payments under two different subsections of MUFTA.

According to West Linn, the loan repayments are fraudulent under § 513.45(b), and the

dividend payments, expense reimbursements, and rent are fraudulent under § 513.45(a).  In

addition, West Linn argues that all of the payments were actually fraudulent under

§ 513.44(a).

       i.      <u>Loan repayments – § 513.45(b)</u>

The Minnesota Uniform Fraudulent Transfer Act prohibits transfers to an insider from

an insolvent debtor:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose
> before the transfer was made if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that time, and the insider had
> reasonable cause to believe that the debtor was insolvent.

Minn. Stat. § 513.45(b).

There is no dispute that the loan repayments to Bourgeois occurred after West Linn's

claims against BTC arose.  There is also no dispute that Bourgeois was an insider of BTC,

and that the alleged debt BTC owed Bourgeois predated West Linn's claim.  West Linn

contends that there is also no serious dispute that BTC was insolvent at the time of the

transfers and that Bourgeois knew or had reason to know that BTC was insolvent.

Defendants argue that BTC was not insolvent because BTC had always paid its bills on time and was not "woefully in debt." (Defs.' Reply Mem. (Docket No. 66) at 5.) Even if the correct standard for insolvency is "woefully in debt," however, the evidence shows that BTC's liabilities exceeded its assets by hundreds of thousands of dollars at the end of May 2013. Under MUFTA, a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets, at fair valuation." Minn. Stat. § 513.42(a). BTC's balance sheet showed that, as of May 31, 2013, BTC had liabilities of more than $316,000 and assets of just under $18,000. (Kilby Aff. Ex. 21.) Defendants' statement that BTC had "adequate capitalization and funding throughout its existence" (Defs.' Reply Mem. at 5), does not constitute evidence that BTC was in fact solvent. It is Defendants' burden to come forward with evidence creating a genuine issue of fact as to whether BTC was solvent in May 2013. The only evidence in the record is that BTC was insolvent.

In addition, although Defendants argue that they believed in good faith that they had a claim against West Linn and thus were justified in not paying West Linn, they could not reasonably have maintained a good-faith belief that BTC did not owe West Linn money for the paper West Linn shipped to ASG and Amidon. BTC might have had a defense to payment, or an expectation that it could somehow recoup some of the money owed to West Linn, but BTC undoubtedly owed West Linn money. The record is clear that, after the substantial payments to Bourgeois, BTC did not have sufficient funds to pay West Linn for the shipments to ASG and Amidon, shipments for which ASG and Amidon had fully paid BTC. BTC has offered no plausible explanation for its failure to pay West Linn for those

12

shipments.  The record establishes that BTC was insolvent at the time of the transfers.

Finally, Bourgeois claims that the undisputed evidence establishes that the loan repayments BTC made to him were made in the ordinary course of BTC's business, and thus are not voidable under MUFTA.  <u>See</u> Minn. Stat. § 513.48(f)(2) (A "transfer is not voidable . . . if made in the ordinary course of business or financial affairs of the debtor and the insider.").  Whether the loan repayments were in the ordinary course of BTC's business is the subject of much dispute.  West Linn contends that the record is devoid of evidence that BTC ever paid Bourgeois on this loan before May 2013.  Defendants argue that BTC did make such payments and point to Bourgeois's deposition to establish this fact.  (Def.'s Reply Mem. at 7 (citing Van Oort Aff. Ex. B (Bourgeois Dep.) at 8-9, 15-16, 20-21).)  But in the cited deposition pages, Bourgeois does not address any alleged repayment of the loan before May 2013, nor does his subsequent testimony address the issue in any way.  There is no evidence in the record to establish that BTC paid Bourgeois for this loan at any time before May 2013.  Absent any such evidence, there can be no genuine dispute as to whether the May and June 2013 loan repayments were in the ordinary course of BTC's business and thus those payments are constructively fraudulent under § 513.45(b).

ii.    <u>Dividend payments, expense reimbursements, rent — § 513.45(a)</u>

West Linn contends that the remaining payments to Bourgeois in May and June 2013 are fraudulent under  § 513.45(a).  This section provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a

13

reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Minn. Stat.§ 513.45(a).  As with West Linn's claim under § 513.45(b), there is no dispute that the transfer here was made after BTC's debt to West Linn arose, and that the debtor was insolvent or rendered insolvent as a result of the transfers.  The ordinary-course defense does not apply to transfers under § 513.45(a).

Defendants contend that the undisputed evidence is that BTC received reasonably equivalent value for these transfers, and that they are therefore not fraudulent under MUFTA. As to the dividend payments, however, there can be no evidence of reasonably equivalent value because a dividend payment is by its nature not an exchange for value.  The dividend payments are therefore constructively fraudulent and must be set aside.

Nor have Defendants offered any evidence that the expense reimbursement payments were for reasonably equivalent value.  Defendants' only evidence is Bourgeois's testimony that the expense reimbursements were legitimate because "expenses were generated [and] receipts were kept."  (Van Oort Aff. Ex. B (Bourgeois Dep.) at 65.)  But there are no receipts in the record to substantiate this claim.  It is Defendants' burden to substantiate BTC's payments to Bourgeois with actual evidence, not Bourgeois's self-serving testimony.  The expense payments are likewise constructively fraudulent and must be set aside.

West Linn argues that, in the absence of a lease agreement and testimony that the rent BTC paid Bourgeois was fair market value, the rent payments also fall within § 513.45(a). But the record establishes that BTC paid Bourgeois $4,800 per month in rent from at least

14

2006 until the company closed in June 2013, and that this rent was the same as the rent BTC paid for its offices before BTC moved into property Bourgeois owned. (Van Oort Aff. Ex. B (Bourgeois Dep) at 20-21.) Whether this amount was fair market value is therefore disputed and West Linn is not entitled to judgment as to its MUFTA claim regarding the rent payments.

### iii.    Actual fraud — § 513.44(a)

West Linn also argues that the payments from BTC to Bourgeois were actually fraudulent under § 513.44(a). This section provides that a transfer is fraudulent as to a creditor if the debtor made the transfer "with the actual intent to hinder, delay, or defraud any creditor of the debtor." Minn. Stat. § 513.44(a). Under this section, the timing of the creditor's claim is irrelevant, as is whether the transfer was in the ordinary course of business. The statute lists 11 factors a court may consider in determining actual fraudulent intent, including whether the transfer was to an insider, the transfer was of substantially all of the debtor's assets, or the debtor was insolvent or became insolvent shortly after the transfer was made. Id. § 513.44(b).

Neither party offers any authority for the proposition that a court may determine actual fraudulent intent as a matter of law. And consideration of the statutory factors requires weighing the evidence, something that is not appropriate on a motion for summary judgment. West Linn is not entitled to summary judgment on its contention that the transfers were actually fraudulent.

2.     **Defendants' Counterclaims**

a.     Termination of Sales Representative Act

West Linn seeks summary judgment on Defendants' claim under Minnesota's Termination of Sales Representative Act, Minn. Stat. § 325E.37.  This Act provides that a "manufacturer, wholesaler, assembler, or importer may not terminate a sales representative unless the person has good cause" and gives written notice 90 days in advance of the termination.  Minn. Stat. § 325E.37, subd. 2.  West Linn insists that BTC was not West Linn's sales representative within the meaning of the Act and thus cannot bring this claim.

A sales representative is a "person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission." Id. subd. 1(d).  But a sales representative is not a person who "places orders or purchases for the person's own account for resale" or someone who "distributes, sells, or offers the goods . . . to end users, not for resale." Id. subd. 1(d)(2), (4).  West Linn argues that the undisputed facts establish that BTC was not a sales representative, while Defendants counter that there are too many factual issues to make a summary determination of this issue appropriate.

Defendants argue that the Court need only examine the differences between the original Complaint's characterization of the West Linn/BTC relationship and the Amended Complaint's characterization of that relationship to establish that BTC was West Linn's sales representative.  For example, the original Complaint stated that West Linn sold its paper "through paper brokers, who act as middlemen" and that BTC "acted as West Linn's broker for ultimate customer [ASG]."  (Compl. ¶ 1.)  The Complaint describes the process as BTC

16

"placing orders with West Linn on behalf of" ASG.  (Id.)  In contrast, the Amended

Complaint states that West Linn sells its paper "to paper distributors, referred to as brokers

or merchants, who resell West Linn paper to their customers" and that BTC "bought West

Linn paper for resale to [ASG]."  (Am. Compl. ¶ 1.)  And the process is described as BTC

"placing orders with West Linn on its own account for paper BTC intended to resell to"

ASG.  (Id.)

        Although the change in characterization may raise Defendants' suspicions, Defendants

must ultimately come forward with evidence to create genuine issues of fact as to their

contention that BTC was West Linn's sales representative under the Act.  The only evidence

is thin:  the parties referred to BTC's profit on paper sales as a "commission," and BTC's

revenue stream was almost entirely dependent on West Linn and ASG.  But other evidence

refutes Defendants' sales-representative counterclaim:  BTC itself placed orders for West

Linn's paper and BTC, not ASG, paid West Linn directly for those orders.  West Linn did

not pay BTC any money, either in commissions or otherwise.  In addition, BTC sold paper

from other mills, such as International Paper, Boise Cascade, and Kimberly-Clark, and thus

was not limited to selling only for West Linn.  (Kilby Aff (Docket No. 52) Ex. 2 (Bourgeois

Dep.) at 273.)  Thus, there is at best conflicting evidence as to whether BTC "place[d] orders

or purchases for [BTC's] own account for resale," Minn. Stat. § 325E.37, subd. 1(d)(2), and

therefore as to whether BTC fits within the Act's definition of sales representative.

        West Linn also contends that BTC sold the paper to end users, so that the Act does not

apply in the first instance.  The Act provides that a sales representative is not someone who

"distributes, sells, or offers the goods . . . to end users, not for resale." Minn. Stat. § 325E.37, subd. 1(d)(4). Defendants argue that ASG was not an end user because it printed on the paper it received from West Linn and then sold the printed paper to its customers, but they offer no legal support for this argument. And indeed, ASG's subsequent use of the paper to make an entirely new product—in this case coupon books, sales circulars and the like—does not mean that ASG is not the end user of West Linn's paper. Under the terms of the Act, BTC sold the goods to end users and was thus not West Linn's sales representative. Defendants' counterclaim under the Sales Representative Act fails.

### b.   Tortious Interference

Defendants counterclaim in the alternative that West Linn tortiously interfered with BTC's relationship with ASG by allegedly conspiring with ASG to terminate its relationship with BTC. BTC has framed this claim as either tortious interference with contract or tortious interference with business relations. But BTC has not argued that there was any contract between ASG and BTC with which West Linn could have interfered, and thus it appears that BTC's claim is one for tortious interference with business relations.

A claim for tortious interference with business relations requires BTC to prove

1) the existence of a reasonable expectation of economic advantage or benefit belonging to [BTC]; 2) that [West Linn] had knowledge of that expectation of economic advantage; 3) that [West Linn] wrongfully and without justification interfered with [BTC's] reasonable expectation of economic advantage or benefit; 4) that in the absence of the wrongful act of [West Linn], it is reasonably probable that [BTC] would have realized [its] economic advantage or benefit; and 5) that [BTC] sustained damages as a result of this activity.

Cenveo Corp., 784 F. Supp. 2d at 1137-38 (citing Harbor Broad., Inc. v. Boundary Waters

Broads., Inc., 636 N.W.2d 560, 569 (Minn. Ct. App.2001)).  There is no dispute that BTC had a reasonable expectation that ASG would continue its relationship with BTC, and that West Linn knew of that expectation.

However, there is no evidence in the record to establish that West Linn had a role in ASG's decision to stop buying paper from BTC.  The only "evidence" to which BTC points is a meeting between a representative from ASG and one from West Linn in December 2012.  But the undisputed testimony regarding this meeting is that ASG, not West Linn, raised the possibility that ASG would switch to a different broker to supply West Linn's paper to ASG.  West Linn's witness testified that he was surprised and put in a good word about BTC with ASG.  (Kilby Decl. (Docket No. 68) Ex. B (Huskey Dep.) at 138-39.)  Indeed, ASG's Director of Procurement's statement on the subject is unequivocal:  the decision to terminate ASG's relationship with BTC was his alone, and "West Linn had nothing to do with" that decision.  (Krause Decl. (Docket No. 55) ¶ 6; see also Kilby Decl. (Docket No. 52) Ex. 11 (Krause Dep.) at 100 (stating that West Linn did not tell ASG to switch from BTC to Unisource).)

Defendants ask the Court to determine, despite the testimony to the contrary, that West Linn did play a role in ASG's decision.  But the Court may only draw reasonable inferences from the evidence submitted, and here the evidence is clear:  the decision to terminate BTC was ASG's, without any interference or suggestion from West Linn.  Defendants have failed to establish any interference, tortious or otherwise, on West Linn's part, and West Linn is entitled to summary judgment on this counterclaim.

**B.     Defendants' Motion**

Defendants' Motion is limited to seeking a dismissal of Bourgeois individually from the lawsuit.  West Linn's first claim against Bourgeois personally is its claim under MUFTA, discussed above.  The record sustains the majority of this claim and there are genuine issues as to other aspects of the claim.  Defendants' Motion on this point is therefore denied.

West Linn's second claim is that the Court should pierce the corporate veil and hold Bourgeois personally liable for BTC's obligations to West Linn "because he used the corporate form of BTC to defraud West Linn."  (Pl.'s Opp'n Mem. (Docket No. 59) at 9.)

Whether to pierce the corporate veil is a legal question that is governed by Minnesota law.  Stoebner v. Lingenfelter, 115 F.3d 576, 579 (8th Cir. 1997).  A corporate officer may be subject to personal liability for a corporation's debts or acts if "the corporate form was used to accomplish a fraudulent purpose."  Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979).  A court may disregard the corporate entity to impose liability on an officer or shareholder or if the corporation was a mere "alter ego" or "instrumentality" of the officer.  Id.  "Disregard of the corporate entity . . . also [requires] that there be an element of injustice or fundamental unfairness."  Id.

West Linn argues that the court should pierce BTC's corporate veil and hold Bourgeois personally liable because he used BTC to defraud West Linn and because BTC was the alter ego or instrumentality of Bourgeois.  Defendants argue that BTC was not formed for a fraudulent purpose, and that Bourgeois was not the alter ego of BTC. Defendants ask the Court to determine as a matter of law that piercing the corporate veil is

20

not appropriate in this case.

According to West Linn, the Court may disregard BTC's corporate form merely because of the fraud West Linn alleges that Bourgeois perpetrated through BTC. As an alternative, West Linn contends that the corporate veil should be pierced because BTC was Bourgeois's alter ego. West Linn argues that the Court can determine as a matter of law that the veil should be pierced.

The remedy of veil-piercing "is generally not available absent proof of the [officer's] fraudulent or wrongful use of the corporate form." In re Intelefilm Corp., 301 B.R. 327, 331 (Bankr. D. Minn. 2003). Thus, West Linn must establish both that Bourgeois wrongfully or fraudulently used the corporate form of BTC and that the elements of the veil-piercing test are met: (1) that the corporation functioned as the "mere instrumentality" of Bourgeois; and (2) that "injustice or fundamental unfairness would occur if the corporate veil were left intact." Stoebner, 115 F.3d at 579.

To determine whether the relationship between Bourgeois and BTC was such that the corporate form should be disregarded, the Court must examine factors such as

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

Victoria Elevator, 283 N.W.2d at 512.

Bourgeois claims that the record is undisputed that BTC was sufficiently capitalized at its inception, and that he at all times maintained the corporate formalities he was required to maintain under state law.  He ignores, however, other evidence in the record, such as that the home equity loan he secured ostensibly for BTC's benefit was never accounted for on BTC's books, that BTC was insolvent or was in danger of being rendered insolvent by the payments BTC made to Bourgeois in May 2013, and that Bourgeois had sole and complete control over all of BTC's operations and was the recipient of substantially all of BTC's assets.  See Victoria Elevator, 283 N.W. 2d at 513 (Court pierced the corporate veil when "defendant did not treat the corporation as a separate entity. He lent it the use of his money and property sometimes calling it a loan, sometimes calling it a transfer of assets, rarely making a formal record of the transaction.")  There are genuine issues of fact as to whether piercing the corporate veil is appropriate in this case, and Bourgeois is not entitled to summary judgment or dismissal from the case on this basis.  Similarly, those issues of fact preclude entry of summary judgment in favor of West Linn on this claim.

**CONCLUSION**

West Linn is entitled to summary judgment on its claims for breach of contract and violations of the Minnesota Fraudulent Transfer Act as to BTC's payment of rent, dividends, expense reimbursements, and loan repayments to Bourgeois, and on Defendants' counterclaims for breach of Minnesota's Sales Representative Act and tortious interference with business relations.  West Linn is not entitled to summary judgment on its claim under the worthless check statute or as to the rent payments under MUFTA.  Defendants have not

established that summary judgment is appropriate on West Linn's claim that the corporate veil should be pierced.

Accordingly, **IT IS HEREBY ORDERED that**:

1.      Plaintiff's Motion for Partial Summary Judgment (Docket No. 51) is **GRANTED in part** and **DENIED in part**;

2.      Plaintiff is entitled to recover the amount of the unpaid invoices, plus reasonable costs and attorney's fees expended in collecting the unpaid amounts; and

3.      Defendants' Motion for Partial Summary Judgment (Docket No. 46) is **DENIED**.

Dated: November 18, 2014

                                                              s/ Paul A. Magnuson
                                                              Paul A. Magnuson
                                                              United States District Court Judge